T.C. Memo. 1999-16


UNITED STATES TAX COURT


AJF TRANSPORTATION CONSULTANTS, INC., ET AL.,[1] Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 12590-95, 24190-96,    Filed January 28, 1999.
             24482-96, 24483-96.


        J is a corporation engaged in furniture delivery
services.  F is J's sole shareholder and president.  J's
client issued checks to J for its delivery services and for
fuel costs.  F cashed the checks personally and diverted the
funds for his own personal benefit.  None of the diverted
funds were reported as income on F's individual tax returns
or on J's corporate tax returns for the 1988, 1989, and 1990
taxable years.  J did not timely file its corporate tax
returns for the years at issue.  R determined that the full
amount of the diverted funds was taxable to both J and F.
R's deficiency notices were issued more than 3 years after J
and F's income tax returns were filed.
        1.  <u>Held</u>: The period of assessment is unlimited
because J and F filed fraudulent tax returns.  Sec.
6501(c)(1), I.R.C.

---

        [1]Cases of the following petitioners are consolidated
herewith: AJF Transportation Consultants, Inc., docket No. 24190-
96; Anthony J. Ferrentino, docket No. 24482-96; and Anthony J.
Ferrentino and Carol L. Ferrentino, docket No. 24483-96.

2.  Held, further, the diverted funds were constructive dividends and taxable to F in the manner provided by secs. 301(c) and 316(a), I.R.C.

3.  Held, further, the diverted funds were properly includable in J's income.  Sec. 61(a), I.R.C.; Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).

4.  Held, further, J and F are liable for additions to tax and penalties under secs. 6653(b) and 6663, I.R.C.

5.  Held, further, J is liable for additions to tax under sec. 6651(a), I.R.C.

Gary D. Borek, for petitioners.

Jerome F. Warner and Raymond M. Boulanger, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, Judge:  Respondent determined deficiencies, additions to tax, and penalties for 1988, 1989, and 1990 with respect to petitioner AJF Transportation Consultants, Inc.'s (AJF) Federal income taxes as follows:

| | | Additions to Tax | | Penalty |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b) | Sec. 6651(a) | Sec. 6663 |
| 1988 | $90,137 | $45,751.50 | $7,284 | |
| 1989 | 66,240 | | 16,560 | $36,099.75 |
| 1990 | 46,694 | | 11,674 | 32,841.75 |

Respondent also determined deficiencies, an addition to tax, and penalties for 1988 and 1989 with respect to petitioners Anthony J. and Carol L. Ferrentino's Federal income taxes, and for 1990 with respect to petitioner Anthony J. Ferrentino's Federal income taxes, as follows:

| | | Addition to Tax | Penalty |
|---|---|---|---|
| Year | Deficiency | Sec. 6653(b) | Sec. 6663 |
| 1988 | $53,480 | $38,440.50 | |
| 1989 | 54,048 | | $32,292.75 |
| 1990 | 110,581 | | 34,201.50 |

The parties have agreed that petitioner Carol L. Ferrentino is entitled to innocent spouse relief under the provisions of sections 6013(e) and 6015 for the 1988 and 1989 taxable years.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by both parties, the remaining issues for decision are: (1) Whether an exception under section 6501(c) to the general 3-year period of limitations on assessment under section 6501(a) applies to petitioners' 1988, 1989, and 1990 taxable years; (2) if so, whether petitioners must include diverted corporate funds in gross income; (3) whether petitioners are liable for the additions to tax for fraud under section 6653(b) for 1988, and the penalties for fraud under section 6663 for 1989 and 1990; and (4) whether petitioner AJF is liable for additions to tax imposed by section 6651(a) for failing to file timely 1988, 1989, and 1990 income tax returns.

## FINDINGS OF FACT

### Background of Petitioners

Anthony J. Ferrentino (Ferrentino) was the president and sole shareholder of AJF during the years at issue. Ferrentino resided in Williamsville, New York, at the time the petitions were filed. Ferrentino married Carol Ferrentino on December 30,

1954.  They separated in the fall of 1985, and on April 6, 1989, they entered into a Separation Agreement, Support and Property Settlement (Separation Agreement).

Under the Separation Agreement, Ferrentino was obligated to pay Carol $376,000 over 8 years.  Specifically, Ferrentino was required to pay Carol Ferrentino $22,000 per year from 1989 to 1992, and was thereafter obligated to pay at least $22,000 per year until the remainder of the obligation was satisfied.  Ferrentino has not paid all the amounts reflected in the Separation Agreement.  At various times between 1989 and 1991, Ferrentino asked Carol to modify their Separation Agreement, or forbear his obligation to pay the required amounts.  Ferrentino told Carol that she would recognize a greater return on her money if she allowed Ferrentino to keep the funds owed invested in AJF.  Their divorce became final on May 4, 1990.

AJF is a New York corporation with principal offices in Williamsville, New York, at the time the petitions were filed.  AJF is involved in the business of furniture delivery and is a cash receipts and disbursement method taxpayer.  AJF's employees were mainly drivers, helpers for loading, helpers for drivers of home deliveries, and tractor-trailer drivers.

During the years in issue, AJF earned income by performing services for J.C. Penney Company, Inc. (J.C. Penney), pursuant to a Delivery Service Agreement (Contract) dated March 6, 1987.  The Contract required AJF to deliver furniture to customers of J.C. Penney and transport furniture for J.C. Penney from various

locations, including the Buffalo, New York, and Toledo, Ohio, distribution centers of J.C. Penney. AJF also performed delivery work for J.C. Penney in other States and delivered fabricated goods for the Buffalo Custom Decorating Division of J.C. Penney.

AJF used the trucks of J.C. Penney to perform its contract services from 1988 to October 1990. Thereafter, AJF supplied both the drivers and the trucks. J.C. Penney reimbursed AJF for fuel purchased by AJF in performing its delivery services under the Agreement. AJF employees used cash and corporate credit cards for the purchase of fuel used in the delivery of J.C. Penney products.

AJF's delivery employees, generally a driver and sometimes a helper, maintained a "trip sheet" which was a diary of their deliveries. The trip sheet formed the basis of AJF's payroll and billing to J.C. Penney. The drivers would also maintain a delivery manifest which listed tasks the drivers were to perform for the day.

When AJF's employees delivered the furniture, they would sometimes collect a COD (Cash on Delivery) from J.C. Penney's customer. Under the Contract, AJF was responsible for the collection of COD's and maintained a COD account which was an account of cash collected from J.C. Penney's customers. The delivery manifest reflected all the COD's collected and the form in which those COD's were paid, e.g., checks, cash, or money orders. The trip sheet or manifest contained the name or names of employees on the particular delivery and listed expenses

incurred by the driver.  As of the time of trial, AJF did not retain the delivery manifests or the trip sheets for the years in issue.

The drivers were authorized to and did use COD cash funds to pay for any expenses such as towing charges or anything out of the ordinary and would insert the invoice for the services in an envelope.

When AJF suffered a shortage of drivers for its scheduled deliveries, it hired leased labor from Manpower Temporary Services.  During 1988, 1989, and 1990, AJF claimed expenses for leased labor in the amounts of $5,074, $16,946, and $22,332, respectively.  AJF also claimed deductions for "driver expenses" for 1988, 1989, and 1990 in the amounts of $37,172, $68,157, and $60,596, respectively.  Respondent has allowed these deductions.

Circumstances Surrounding Ferrentino's Cashing of AJF's Delivery Service and Fuel Reimbursements Checks

During the years in issue, Ferrentino controlled all the checks issued from J.C. Penney to AJF.  Ferrentino determined whether he would cash checks personally or have them deposited into AJF's corporate operating account.  Ferrentino knew that AJF corporate income was determined by its accountants by examining deposits into AJF's bank account.  AJF's gross income was determined from deposits to the bank account which were reflected in the cash receipts journal.  He also knew that if the checks

for fuel reimbursement and delivery services were not deposited into AJF's bank account, then corporate income tax returns would not reflect these amounts.

J.C. Penney Custom Decorating Divisions (Custom Decorating) issued checks to "AJF and/or A.J. Ferrentino" for services performed. Ferrentino cashed checks issued by Custom Decorating in the following amounts:

| Year | Amount Cashed by Ferrentino |
|------|------------------------------|
| 1988 | $70,721.02 |
| 1989 | 57,680.35 |
| 1990 | 53,030.51 |

AJF did not include these amounts in gross income on its Federal income tax returns.

The J.C. Penney Buffalo distribution center issued checks for fuel reimbursement solely to Ferrentino. During the years at issue, Ferrentino cashed all but two fuel reimbursement checks from the Buffalo distribution center. The cashed check proceeds totaled:

| Year | Amount Cashed by Ferrentino |
|------|------------------------------|
| 1988 | $66,194.16 |
| 1989 | 65,725.26 |
| 1990 | 109,684.97 |

The J.C. Penney Toledo distribution center issued checks for fuel reimbursement to "Anthony J. Ferrentino/AJF Trans. Inc." Ferrentino cashed these checks in the following amounts:

| Year | Amount Cashed by Ferrentino |
|------|------------------------------|
| 1988 | $26,457.17 |
| 1989 | 26,163.56 |
| 1990 | 148.34 |

AJF maintained a cash disbursements journal which tracked, among other things, fuel expenses, but the journal did not account for fuel reimbursements from J.C. Penney. Employees of AJF would prepare an invoice entitled Fuel Billing which would be sent to J.C. Penney for fuel reimbursement. These Fuel Billings also included amounts for tolls and truck repairs. AJF's accountants would use the cash disbursements journal to prepare AJF's tax returns and financial statements.

AJF claimed deductions for "gas, oil and tires" expenses in 1988 and 1989 in the amounts of $184,621 and $183,651, respectively. In 1990, AJF claimed a deduction for fuel expenses of $195,035. AJF did not include any amounts relating to fuel reimbursements in gross income.

Ferrentino's Cash Hoard

AJF maintained a business operating account at Manufacturers Hanover Trust Co. (subsequently purchased by Fleet Bank). Ferrentino cashed checks on approximately a weekly basis, usually averaging $7,000 to $9,000 per transaction and paid in $100 denominations. On January 11, 1991, Ferrentino presented for exchange $122,600 in water-damaged currency to the Federal Reserve Bank in Buffalo. Of the amount presented, $75,000 was in denominations of $100 or larger.

## Ferrentino's Guilty Plea to Filing a False Tax Return

On April 13, 1995, Ferrentino pleaded guilty to a one count information charging him with willfully making and subscribing to a false and fictitious U.S. income tax return for the year 1988 in violation of section 7206(1). On January 29, 1996, Ferrentino filed Forms 1040X, Amended U.S. Individual Income Tax Return, for the taxable years 1988, 1989, and 1990, which reported additional income in the amounts of $30,975, $28,870, and $32,572, respectively.

## Respondent Issued Notices of Deficiency After the 3-Year Period of Limitations on Assessment Had Expired

Ferrentino filed timely tax returns for the 1988, 1989, and 1990 taxable years. AJF, on the other hand, filed its tax returns late. AJF filed its 1988 and 1989 tax returns on May 10, 1991, and its 1990 return on July 17, 1991.

Respondent mailed notices of deficiency on August 13, 1996, with respect to petitioners' 1988, 1989, and 1990 income tax returns. The general 3-year period of limitations on assessment under section 6501(a) expired before the issuance of the notices of deficiency in these consolidated cases.

## Circumstances Surrounding the Late Filing of AJF's Tax Returns

John Witkowski, C.P.A. (Witkowski), prepared AJF's tax returns during the years in issue. When preparing the returns, Witkowski relied on AJF's books and records, which included receipts journals, disbursement journals, payroll records, and bank reconciliations. Witkowski determined AJF's gross income

from AJF's cash receipts journal.  Expenses were determined using check registers and cash-paid-out journals.  AJF's books and records did not disclose amounts pertaining to the fuel reimbursement checks from the J.C. Penney distribution centers, nor did they disclose the Custom Decorating checks for delivery services.

In general, after the returns were prepared for clients including petitioners, Witkowski's office would contact the client, who would normally pick them up.  If the client had not picked them up after a reasonable length of time, Witkowski's office would again contact the client.

Witkowski signed AJF's corporate returns for 1988, 1989, and 1990 on June 15, 1989, June 1, 1990, and July 8, 1991, respectively.  For some unexplained reason, the 1988 and 1989 corporate returns reflect that Ferrentino signed them on May 6, 1991.  He signed the 1990 corporate return on July 12, 1991.

OPINION

## I.  Fraudulent Return Exception

Since the 3-year period of limitations on assessment under section 6501(a) has expired with respect to the taxable years at issue, respondent is barred from assessing the deficiencies unless an exception to section 6501(a) applies.
However, section 6501(c) provides exceptions to the general rule.
The pertinent exception in this case is found in section 6501(c)(1) which provides that "In the case of a false or

fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time."

Where respondent asserts that a taxpayer has filed a fraudulent return with the intent to evade tax, the burden of proof is on the respondent. Sec. 7454(a); Rule 142(b). Respondent must satisfy his burden of proof with "clear and convincing evidence". Rule 142(b); Fox v. Commissioner, 61 T.C. 704, 717 (1974). To establish fraud, respondent must prove, by clear and convincing evidence, for each year and with respect to each petitioner, that: "(1) petitioner underpaid his income tax and (2) some part of the underpayment was due to fraud." Recklitis v. Commissioner, 91 T.C. 874, 909 (1988) (citations omitted); see also Hebrank v. Commissioner, 81 T.C. 640, 642 (1983).

Although respondent need not prove the precise amount of the underpayment resulting from fraud, respondent may not carry his burden by merely relying on a taxpayer's failure to carry the burden of proof on the underlying deficiency. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Otsuki v. Commissioner, 53 T.C. 96, 106 (1969).

A. Underreporting of Tax

Respondent asserts that petitioners had unreported income arising from the checks issued by J.C. Penney for delivery services rendered by AJF to Custom Decorating and fuel reimbursements for fuel expenses incurred by AJF.

Petitioner AJF concedes that checks which were cashed by Ferrentino, received from Custom Decorating for delivery services, should have been included in AJF's gross income. However, petitioners argue that the fuel reimbursements are not includable in gross receipts of AJF, and the proceeds from Ferrentino's check cashing are not includable in his gross income because he used the proceeds to pay "casual labor" for performance of services for which the checks were issued, entitling him to deduct such amounts from gross income resulting in no underpayment.

### 1. Fuel Reimbursement Checks

The first question is whether the fuel reimbursement checks should be included in AJF's gross income. Section 61(a) defines the term "gross income" as "all income from whatever source derived", except as otherwise provided by law. Income has been defined as "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). Unless specifically excluded by another provision of the Internal Revenue Code, all income is subject to tax. Id. at 430. Therefore, reimbursed expenses must be included in gross income, but these expenses may be deducted only if allowed under other provisions of the Internal Revenue Code and if adequately substantiated. Rietzke v. Commissioner, 40 T.C. 443, 453 (1963); Vaughn v. Commissioner, T.C. Memo. 1992-317, affd. without published opinion 15 F.3d 1095 (9th Cir. 1993).

Petitioners argue that the unreported fuel reimbursement checks should not be included in gross income because the checks were repayments of a loan made from AJF to J.C. Penney for expenses incurred by AJF on behalf of J.C. Penney. It is true that we have previously held that "'where a taxpayer makes expenditures under an agreement that he will be reimbursed therefor, such expenditures are in the nature of loans or advancements and are not deductible as business expenses.'" Canelo v. Commissioner, 53 T.C. 217, 224 (1969) (quoting Patchen v. Commissioner, 27 T.C. 592, 600 (1956)), affd. 447 F.2d 484 (9th Cir. 1971).

Nevertheless, as respondent points out, AJF deducted amounts for fuel reimbursement expenses on its 1988, 1989, and 1990 tax returns which persistent course of action is inconsistent with petitioners' assertion that the reimbursements were repayments of a loan. We have also held that "Taxpayers are entitled to attack the form of their transactions only when their tax reporting and other actions have shown an honest and consistent respect for what they argue is the substance of the transactions." FNMA v. Commissioner, 90 T.C. 405, 426 (1988), affd. 896 F.2d 580 (D.C. Cir. 1990).

Neither AJF's cash disbursements journal nor other accounting records treated the fuel reimbursements as loan repayments. Had AJF intended to treat the fuel reimbursement arrangement as a loan, it would not have claimed deductions for fuel expenses.

In sum, AJF's tax reporting and other actions have not shown an honest and consistent respect for what petitioners argue is the substance of these reimbursements. Therefore, respondent has shown by clear and convincing evidence that the fuel reimbursement checks should be included in AJF's gross income.

2. Inclusion of AJF's Custom Decorating Checks and Fuel Reimbursement in Ferrentino's Gross Income

The next question is whether Ferrentino, as president and sole shareholder of AJF, must include the Custom Decorating and fuel reimbursement checks in gross income because he cashed the checks personally. Generally, "income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." Corliss v. Bowers, 281 U.S. 376, 378 (1930).

Respondent argues that Ferrentino should include the diversions as ordinary income. Ferrentino, on the other hand, argues that the cashed checks do not represent income to him because he received the checks on behalf of AJF as its "agent" and that the cash was held in "constructive trust" to pay a business expense of AJF.

Generally, "a taxpayer need not treat as income moneys which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit." Diamond v. Commissioner, 56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974). No tax is imposed upon the receipt of money in a fiduciary or agency capacity. Stone v.

Commissioner, 865 F.2d 342, 343 (D.C. Cir. 1989); Heminway v. Commissioner, 44 T.C. 96, 101 (1965). However, where a shareholder uses corporate property for his personal benefit, not proximately related to corporate business, the shareholder must include the value of the benefit in income as constructive dividends to the extent of the corporation's earnings and profits. DiZenzo v. Commissioner, 348 F.2d 122, 125 (2d Cir. 1965), revg. in part and remanding for additional findings to support the Tax Court's holding, T.C. Memo. 1964-121, remanding T.C. Memo. 1966-16; Truesdell v. Commissioner, 89 T.C. 1280, 1294 (1987); Falsetti v. Commissioner, 85 T.C. 332, 356 (1985).

Ferrentino argues that he used the check proceeds to pay for "casual labor" needs of AJF during certain peak times or when additional help was needed. Respondent counters that any additional labor needs of AJF were satisfied by the use of leased helpers from Manpower Services.

The burden of proof to establish the existence of cash payments to casual labor is on petitioners. Once respondent establishes the existence of unreported income and allows the deductions claimed on the return, he does not have the further burden of proving the negative that the taxpayer did not have any additional deductions. See Perez v. Commissioner, T.C. Memo. 1974-211 (citations omitted). One Court of Appeals has stated that "This rule is grounded on the realization that it would be virtually impossible for the Government to show the negative fact

that a taxpayer had no unreported deductions or exclusions." United States v. Bender, 218 F.2d 869, 871 (7th Cir. 1955). Respondent is entitled to rely on the

> presumption that the deductions and exclusions listed by a taxpayer in his return are all that exist. This presumption is based upon reasonable experience * * * and has the effect of shifting the burden of going forward with the evidence to the * * * [taxpayer], when the Government has shown unreported income. [United States v. Lennon, 246 F.2d 24, 27 (2d Cir. 1957) (quoting United States v. Bender, supra at 871-872).]

In this case, Ferrentino has admitted, by filing amended returns for the years in issue, that he had unreported income. AJF has conceded that it should have reported the amounts earned from delivery services for Custom Decorating. Furthermore, respondent has shown that the fuel reimbursement check amounts should have been included in AJF's gross income. Therefore, since respondent has shown that petitioners had unreported income, the burden of proving the existence of cash payments to casual labor lies with Ferrentino.

Relying on Perez v. Commissioner, supra; Richardson v. Commissioner, 264 F.2d 400 (4th Cir. 1959), affg. in part, revg. in part T.C. Memo. 1958-59, and H.J. Feinberg & Co., Inc. v. Commissioner, a Memorandum Opinion of this Court dated Sept. 20, 1950, Ferrentino argues that respondent should be required to present affirmative evidence disputing Ferrentino's claim of "casual labor" expenditures. In these cases, the courts recognized that understatements of gross receipts did not establish that a taxpayer had fraudulently intended to evade tax

where the taxpayer also showed that he had offsetting deductions relating to such receipts that he failed to claim on his return. Zack v. Commissioner, T.C. Memo. 1981-700, affd. 692 F.2d 28 (6th Cir. 1982).

The taxpayers in Perez, Richardson, and H.J. Feinberg & Co., Inc. submitted positive proof that unreported deductible payments were in fact made and were related to their respective unreported receipts. Zack v. Commissioner, supra. Based on such proof, the courts shifted the burden of going forward to the Commissioner to prove that at least some unreported net income resulted from the unreported transactions. Id. Therefore, to shift such burden to respondent, Ferrentino must submit credible evidence of whether and to what extent he made such payments.

The underlying support for Ferrentino's claimed "casual labor" cash payments rests on Ferrentino's credibility, on the testimonial credibility of AJF's employees, and on a report authored by Elaine Brittain (Brittain), AJF's office manager.

It is well established that we are not required to accept self-serving testimony in the absence of corroborating evidence. Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Ferrentino testified that he cashed the checks when he needed funds to pay for casual labor. Brittain testified that she obtained cash from Ferrentino to cover shortages of COD funds received by the drivers. But Brittain's testimony indicates that she did not have personal knowledge of a casual laborer ever working at AJF. Donald

Travis, an employee of AJF, testified that he could recall hiring his son, Doug, and a person named Harold. Andrew Davis, another employee, testified that he had once hired his ex-brother-in-law, and a "big Indian gentleman" whose name started with a "C" and was "7 foot tall."

For the reasons stated below, we hold that Ferrentino has not submitted credible evidence of any cash payments made to casual labor.

Petitioners have presented no documentation to corroborate the oral testimony of the above-mentioned witnesses. AJF did not maintain any records of alleged payees who received cash for services performed as casual laborers during the 1988, 1989, and 1990 taxable years. AJF did not retain the trip sheets or delivery manifests which might have verified the existence of casual labor. AJF did not maintain any lists of names of any casual laborers, records reflecting casual labor hours worked, or records of individual earnings in a given year of any casual laborer. Employment tax returns prepared by Brittain did not show casual laborers being paid in cash. AJF did not maintain records of how many alleged casual laborers were paid in cash. Finally, AJF did not require receipts from alleged casual laborers when they were paid in cash.

A factor which dilutes the credibility of Ferrentino and Brittain's testimony is that casual labor was never mentioned during audit. Revenue Agent Kathleen Oswald, who conducted the audit of AJF, testified that neither Ferrentino nor Brittain had

disclosed casual labor expenses during audit. Had Ferrentino actually paid cash for casual labor, we think that Ferrentino or Brittain would have disclosed the payments during the audit process instead of waiting until litigation commenced.

Petitioners did not introduce testimony of any purported casual laborer. The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that, if produced, it would be unfavorable. <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Donald Travis testified that his son Doug was used as casual labor. Andrew Davis testified that he hired his ex-brother-in-law as a casual laborer. We think that petitioners could have called these people to testify, under subpoena, if necessary, without undue hardship. Therefore, we presume that these alleged casual laborers would have testified unfavorably.

Petitioners' most strenuous effort to establish cash payments for casual labor took the form of a report (Report) authored by Brittain which attempted to illustrate the use by AJF of cash payments in very large amounts for casual labor. If the Report were to be believed, AJF expended cash for casual labor in the respective amounts of $98,670.65, $138,220.40, and $102,480 in 1988, 1989, and 1990, respectively.

Petitioners claim that Brittain's Report accurately computed the number of hours attributable to the alleged casual labor by

comparing AJF's payroll figures to the billing invoices for services rendered by AJF to J.C. Penney. Brittain used the billing invoices to determine the total number of manpower hours AJF employees actually rendered to J.C. Penney. She used AJF's payroll records to determine the number of manpower hours attributable to AJF employees as reflected on the payroll records. The Report attributed the difference between the payroll and billing invoice figures to "casual labor". For example, the Report concludes that for the second quarter of 1988 the manpower hours attributable to casual labor totaled 2464.3 hours. The Report derived this figure by subtracting 41,670.3 manpower hours shown on AFJ's payroll records from the manpower hours of 44,134.6 shown on the invoices.

Brittain's Report is laced with flaws. For purposes of computing payroll manpower hours, the Report treated all employees listed in the Report as drivers, even though they had helpers who were also on the payroll. The record indicates that a delivery truck required two people: a driver and a helper. Brittain testified that she had no way of knowing which individual was a driver or a helper. In fact, she had no way of knowing, in her Report and the records it was based on, the capacity in which a particular employee was employed. Thus, drivers listed in the Report could instead have been helpers. The Report thus arbitrarily assumes that the helper on any given delivery truck crew must have been a casual laborer not listed on the payroll who was paid in cash. It follows that the hours

attributed to casual labor--if any were in fact hired--were erroneously increased because payroll manpower hours were erroneously treated as drivers' hours alone.  Moreover, the Report does not account for the hours attributable to leased labor which AJF had deducted on its tax returns.  This omission further erroneously inflates the hours attributable to casual labor.  Therefore, we cannot trust the accuracy of the Report.

The credibility of Brittain's Report is further challenged by other evidence.  Brittain admitted on direct examination that her Report was prepared specifically for this litigation to support her theory that there must have been substantially more manpower hours than shown on AJF's payroll records, and which therefore must have been worked by casual laborers paid solely in cash.  As we have observed, AJF failed to produce records which could have verified the existence of casual labor and the numbers used in the Report.  Brittain testified that the trip sheets that drivers used, nonexistent as of the time of trial, would have shown whether casual labor was used.  Since the Report bases manpower hours attributable to delivery services on the trip sheets, these key figures in the Report cannot be verified. Brittain did not keep any records on the number of alleged casual laborers used.

Brittain testified that she had knowledge of casual labor being paid in cash, but did not include the amount paid to casual labor on employment tax returns and did not withhold amounts from laborers' wages.  Brittain also testified that she knows

everything about the business of AJF, with the exception of how to drive a truck, but does not know how many casual laborers were used. Finally, Brittain's testimony indicates that she herself doubts the accuracy of her Report. When asked whether the Buffalo office hired casual laborers, Brittain replied, "probably, yes." The tentativeness of her response suggests a significant lack of confidence in her Report.

Based on the foregoing, we reject the Report in its entirety due to its flawed analysis and lack of credibility. Since Ferrentino cannot show that payments were made for casual labor, we conclude that Ferrentino used the funds derived from cashing the delivery service and fuel reimbursement checks solely for his own benefit.

Since Ferrentino used the check proceeds solely for his personal benefit, we must then decide whether Ferrentino must include the value of the check proceeds as dividends in gross income. Under sections 301(c) and 316(a), dividends are taxable to the shareholder as ordinary income to the extent of the corporation's earnings and profits, and any amount received by the shareholder in excess of earnings and profits is considered a nontaxable return of capital to the extent of the shareholder's basis in his stock. Any amount received in excess of both the earnings and profits of the corporation and the shareholder's basis in his stock is treated as gain from the sale or exchange of property. Truesdell v. Commissioner, 89 T.C. 1280, 1294-1295 (1987).

Dividends may be formally declared or they may be constructive. A constructive dividend is found where a corporation confers a benefit upon its shareholder in order to distribute available earnings and profits without expectation of repayment. Truesdell v. Commissioner, supra at 1295. Therefore, if Ferrentino is to be required to include the constructive distribution in gross income as a dividend, AJF must have had earnings and profits sufficient to support the distribution of a dividend.

The U.S. Court of Appeals for the Second Circuit, the Court to which this case would normally be appealable, has held that in cases where the Commissioner alleges fraudulent intent to evade income tax with respect to the diversion of corporate funds which is not per se unlawful, the burden of proof is on the taxpayer to establish that the corporation did not have earnings and profits equal to the amounts diverted. DiZenzo v. Commissioner, 348 F.2d at 127.

Section 312(a) provides that a corporation's earnings and profits are reduced by, among other things, the amount of money distributed with respect to its stock. Earnings and profits for a particular period include tax-exempt income, as well as items included in gross income under section 61. Sec. 1.312-6, Income Tax Regs. We are required to make a finding as to whether AJF had sufficient earnings and profits to sustain a dividend. DiZenzo v. Commissioner, supra at 127 (remanding to the Tax Court

to make a finding with respect to whether amounts of accumulated earnings and profits were at least equal to a constructive distribution).

The only evidence with respect to AJF's earnings and profits is AJF's tax returns for 1988, 1989, and 1990. The tax returns reveal that AJF reported taxable income of $151,199 and $247,037 in 1988 and 1989, respectively. AJF's 1990 tax return reports a $2,169 loss. Since we have held that AJF should have included the amounts of the checks cashed by Ferrentino in gross income, earnings and profits for 1988, 1989, and 1990 must be increased by $163,372.35, $135,458.78, and $162,863.82, respectively. If distributed funds constitute constructive dividends, earnings and profits should be reduced by such amount under section 312(a). Enoch v. Commissioner, 57 T.C. 781, 800 (1972). Because AJF is on the cash receipts and disbursements method of accounting, accrued tax liabilities and penalties do not reduce earnings and profits until paid. Sec. 1.312-6(a), Income Tax Regs. Petitioners have presented no credible evidence requiring the further reduction of AJF's earnings and profits.

We conclude that petitioners have not shown that AJF had insufficient earnings and profits to sustain a dividend to Ferrentino for each of the years in issue. The evidence shows that AJF had sufficient current earnings and profits to sustain a dividend in each of the 1988 and 1989 taxable years. Although AJF shows a deficit of $2,169 in taxable income for the 1990 taxable year, AJF had sufficient accumulated earnings and profits

to sustain a dividend.  Therefore, the constructive distributions from AJF to Ferrentino must be included in Ferrentino's income as a dividend.

Accordingly, we hold that respondent has shown by clear and convincing evidence that Ferrentino had underpayments in tax for the years in issue due to unreported dividend income in the amounts he diverted from AJF by cashing the Custom Decorating and fuel reimbursement checks.

B.  Underpayments Due to Fraud

Since we have found that respondent has shown by clear and convincing evidence that petitioners had underpayments of tax for the years in issue, the next issue is whether some part of petitioners' underpayment each year was due to fraud with the intent to evade tax.  Fraud is established by showing that the taxpayer intended "to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax." Recklitis v. Commissioner, 91 T.C. at 909.  Tax evasion need not be a primary motive, but the respondent may satisfy his burden by showing that a "'tax-evasion motive [played] any part' in petitioner's conduct". Id.  Respondent must establish fraud on the part of each petitioner for each taxable year involved by clear and convincing evidence.  Otsuki v. Commissioner, 53 T.C. 96, 105 (1969).

The fraud of a sole or dominant shareholder can be attributed to the corporation. Benes v. Commissioner, 42 T.C. 358, 383 (1964), affd. 355 F.2d 929 (6th Cir. 1966); see also

DiLeo v. Commissioner, 96 T.C. at 875 (1991), ("[C]orporate fraud necessarily depends upon the fraudulent intent of the corporate officers."), affd. 959 F.2d 16 (2d Cir. 1992). In these cases, Ferrentino is the sole shareholder and president of AJF. He exercised total control over all the checks issued from J.C. Penney to AJF. Ferrentino determined whether he would cash checks personally or have them deposited into AJF's corporate operating account. We think Ferrentino exercised sufficient control over the affairs of AJF to justify imputing to AJF any fraud committed by Ferrentino.

The existence of fraud is a question of fact to be resolved upon examination of the entire record. Parks v. Commissioner, 94 T.C. 654, 660 (1990); Recklitis v. Commissioner, supra at 909. Fraud is never presumed, but it must be established by independent evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, supra at 105. Fraud may be proven by circumstantial evidence because direct evidence of the taxpayer's intent is rarely available. Recklitis v. Commissioner, supra at 910; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

Circumstantial evidence of fraud includes:

> (1) Consistent and substantial understatement of income, (2) failure to maintain adequate records, (3) failure to cooperate with an IRS investigation, (4) inconsistent or implausible explanations of behavior and (5) awareness of the obligation to file returns, report income and pay taxes. [Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990) (citing Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601).]

Other badges of fraud include concealing assets, extensive dealings in cash, Recklitis v. Commissioner, supra at 910, failure to file timely returns, Kotmair v. Commissioner, 86 T.C. 1253, 1261 (1986), and failure to provide tax return preparers with complete and accurate information, Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. T.C. Memo. 1985-63.

Ferrentino presented a cash hoard of $122,600 to the Federal Reserve Bank in Buffalo, New York. According to the required Currency Transaction Report, $75,000 of the amount presented was in bills of $100 or higher. The record indicates that when Ferrentino cashed the Custom Decorating and fuel reimbursement checks, Manufacturer's Hanover would generally cash the checks in $100 denominations. During audit, Ferrentino told Revenue Agent Oswald: (1) He did not report the cash hoard as income, (2) he knew that the source of the cash hoard constituted taxable income, and (3) he called the cash hoard pocket monies. At trial, Ferrentino explained that he had accumulated the cash hoard over a period of 15 to 18 years. He further testified that the cash hoard resulted from the selling and restoration of furniture and that he accumulated the cash hoard in anticipation of his divorce.

Based on the amount of $100 bills presented to the Federal Reserve Bank and the fact that Ferrentino received $100 bills when cashing the checks at Manufacturer's Hanover, we may justifiably infer that part of Ferrentino's cash hoard was attributable to the cashed checks. We may further infer that

Ferrentino hoarded the cash to conceal income from his wife, Carol Ferrentino, in order to avoid meeting the obligations enumerated in the Separation Agreement.  It is therefore fair to apply to Ferrentino and his devious course of conduct what we said in a prior case; namely, "that a man who will misappropriate another's funds to his own use through * * * concealment will not hesitate to * * * conceal his receipt of those same funds from the Government with intent to evade tax."  McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).

Ferrentino's extensive use of cash is a further badge of fraud because it indicates a desire to avoid detection of income-producing activities.  Bradford v. Commissioner, T.C. Memo. 1984-601, affd. 796 F.2d 303 (9th Cir. 1986).  Petitioners have not presented credible evidence of cash payments to casual labor.  Furthermore, Ferrentino did not disclose during audit that the delivery service and fuel reimbursement checks were issued and cashed.  Instead, respondent became aware of Ferrentino's dealings only through contacts with J.C. Penney and Wittlin, Ferrentino's accountant at the time.  The circumstances here suggest that Ferrentino was attempting to conceal income.

Ferrentino pleaded guilty to violating section 7206(1) for the taxable year 1988.  Section 7206(1) makes it a crime for a taxpayer to willfully make and submit any return verified by a written declaration that it is made under the penalties of perjury which he does not believe to be true and correct as to every material matter.  Wright v. Commissioner, 84 T.C. 636, 639

(1985).  While not dispositive on the issue of fraud, it is a factor we may consider relevant.  See id. at 639-640.  The Supreme Court has defined "willfully", as used in section 7206(1), as "a voluntary, intentional violation of a known legal duty."  United States v. Pomponio, 429 U.S. 10, 12 (1976).  We think Ferrentino's intentional filing of a false tax return for 1988 is strong indicia of fraudulent intent with respect to the 1988 taxable year.

The failure to provide tax return preparers with complete and accurate information is also an indication of fraud.  Witkowski determined AJF's gross income from AJF's cash receipts journal.  AJF's books and records did not disclose the fuel reimbursement checks from the J.C. Penney distribution centers, nor did they disclose the delivery service checks from Custom Decorating.  Ferrentino knew that AJF's corporate income was determined by deposits to its operating account.  He also knew that by not depositing the Custom Decorating and fuel reimbursement checks, AJF's corporate tax returns would not report these amounts.  Under these circumstances, Ferrentino's failure to provide accurate information to Witkowski is strong indicia of fraud with the intent to evade tax.

Petitioners' failure to maintain adequate books and records of alleged casual labor is further evidence of fraudulent intent.  See Spies v. United States, 317 U.S. 492, 500 (1943); Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980); Zack v. Commissioner, T.C. Memo. 1981-700.  Petitioners failed to

maintain records of trip sheets and manifests which would have verified the existence of casual labor and cash payments to the alleged casual labor. Petitioners failed to keep a list of the names and Social Security numbers of alleged casual laborers. We think petitioners intentionally chose not to maintain adequate records of their activities in order to conceal income.

Finally, petitioners AJF and Ferrentino have deliberately failed to report $442,138 and $475,805.34, respectively, in cashed checks over the course of the 3 taxable years in issue.

We conclude that respondent has proven by clear and convincing evidence that at least part of petitioners' underpayment for each taxable year involved is attributable to fraud with the intent to evade tax. Therefore, the fraudulent return exception under section 6501(c)(1) applies.

II. The Additions to Tax and Fraud Penalties Under Secs. 6653(b) and 6663(a)

Respondent has determined that petitioners owe additions to tax and penalties under sections 6653(b) and 6663(a). Section 6663(a) provides: "If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." Once the Secretary establishes that a part of an underpayment is due to fraud, "the entire underpayment shall be treated as attributable

to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud."  Sec. 6663(b).

The burden that respondent bears in proving fraud under section 6501(c)(1) is the same burden that he bears in establishing fraud for purposes of the section 6663(a) penalty. Ruidoso Racing Association, Inc. v. Commissioner, 476 F.2d 502, 507 (10th Cir. 1973), affg. in part and remanding in part T.C. Memo. 1971-194; DeBrouse v. Commissioner, T.C. Memo. 1988-119, affd. 878 F.2d 379 (4th Cir. 1989).  Since respondent has met his burden for purposes of section 6501(c)(1), we hold that respondent has established that a portion of petitioners' underpayment is due to fraud for purposes of section 6663(a).  We further hold that petitioners have not presented credible evidence that any portion of their underpayment was not due to fraud.  Accordingly, we sustain respondent's determination for additions to tax and penalties imposed by sections 6653(b) and 6663(a).

III.  Additions to Tax Under Sec. 6651

Respondent determined that petitioner AJF was liable for the additions to tax imposed by section 6651(a).  Section 6651(a) imposes an addition to tax for failing to file a timely income tax return, unless such failure to file is due to reasonable cause and not due to willful neglect.  The addition to tax is 5 percent of the amount required to be reported on the return for each month or fraction thereof during which such failure to file

continues, but not to exceed 25 percent in the aggregate. Sec. 6651(a). In this case, AJF's 1988, 1989, and 1990 tax returns were due on March 15, 1989, 1990, and 1991, respectively. Sec. 6072(b). AJF filed its 1988 and 1989 returns on May 10, 1991, and its 1990 return on July 17, 1991. Unless AJF can show that its failure to timely file its returns was due to reasonable cause and not due to willful neglect, respondent's determination will be sustained.

The term "reasonable cause" as set forth in section 6651(a) has been defined as the exercise of ordinary business care and prudence. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. "Willful neglect" means a "conscious, intentional failure or reckless indifference." United States v. Boyle, 469 U.S. 241, 246 (1985). The question of whether a failure to file timely is due to reasonable cause and not willful neglect is one of fact, on which petitioners bear the burden of proof. Rule 142(a); Lee v. Commissioner, 227 F.2d 181, 184 (5th Cir. 1955), affg. a Memorandum Opinion of this Court dated July 31, 1953; BJR Corp. v. Commissioner, 67 T.C. 111, 131 (1976).

Taxpayers have a nondelegable duty to file timely tax returns. United States v. Boyle, supra at 250. Reasonable cause for the failure to timely file the return cannot be established merely by stating that such return was in the hands of the agent. Lynch v. Commissioner, T.C. Memo. 1983-173 (citing Logan Lumber Co. v. Commissioner, 365 F.2d 846, 854 (5th Cir. 1966), affg. T.C. Memo. 1964-126).

In this case, AJF neglected to retrieve its tax returns from its return preparer, Witkowski, and timely file them with respondent.  Therefore, we find that AJF's untimely filing of its returns was not due to reasonable cause.  Accordingly, we sustain respondent's determination with respect to the additions to tax imposed by section 6651(a) for AJF's 1988, 1989, and 1990 taxable years.

Contentions not addressed are either irrelevant or without merit.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.